**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| IN RE SWERVEPAY ACQUISITION, LLC | )<br>) | Consolidated C.A. No.<br>2021-0447-KSJM |

## POST-TRIAL MEMORANDUM OPINION
## ADDRESSING EVIDENTIARY ISSUE

Date Submitted: July 10, 2025
Date Decided: July 29, 2026

Peter J. Walsh, Jr., Nicholas D. Mozal, Ryan M. Crowley, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Orion Armon, COOLEY LLP, Denver, Colorado; Luke Cadigan, Timothy Cook, COOLEY LLP, Boston, Massachusetts; Caroline Pignatelli, Alessandra Rafalson, Katelyn Kang, COOLEY LLP, New York, New York; Matthew Martinez, COOLEY LLP, San Diego, California; Bradley Levison, Carrie A. Herschman, HERSCHMAN LEVISON PLLC, Chicago, Illinois; *Counsel for SPOSC Investment Holdings, LLC, Jaeme Adams, Katrina Adams, and Christopher Hamilton.*

A. Thompson Bayliss, Caleb Theriot, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Jay P. Lefkowitz, Dan Cellucci, Mary T. Reale, Amal El Kakhar, KIRKLAND & ELLIS LLP, New York, New York; Anna Rotman, KIRKLAND & ELLIS LLP, Houston, Texas; Jeremy Fielding, KIRKLAND & ELLIS LLP, Dallas, Texas; *Counsel for OSC Investment, L.P., OSC Investment GP, LLC, New Mountain Capital, LLC, New Mountain Partners V, L.P., New Mountain Investments V, LLC, BSIP OS, LLC, Eir Partners LLC, and Robert Wechsler.*

**McCORMICK, C.**

This case arises from OSC Investment, L.P.'s acquisition of SwervePay, LLC.[1] Sellers claim that Buyers fraudulently induced them into entering the purchase agreement and attendant employment agreements, and that claim proceeded to trial. As part of their damages, Sellers seek an amount equal to the earnouts they would have received under the purchase agreement had Buyers' misrepresentations been true. During this litigation, Buyers sent Sellers a statement purportedly showing Sellers' progress toward target metrics triggering the earnouts. The statement reflects key metrics—a take rate and conversion rate—that are inconsistent with other of Buyers' contemporaneous internal documents. At trial, Buyers relied on the statement to prove those metrics and argue that Sellers failed to prove proximate causation. According to Buyers, Sellers would never have achieved their earnout targets regardless of any alleged fraud. Sellers dispute the admissibility of the earnout statement, and for good reason. This decision finds that the earnout statement's take and conversion rates should be given no weight.

---

[1] This decision refers to OSC Investment, L.P.; OSC Investment GP, LLC; New Mountain Capital, LLC; New Mountain Partners V, L.P.; New Mountain Investments V, LLC; BSIP OS, LLC; Eir Partners LLC; and Robert Wechsler collectively as "Buyers" and to SPOSC Investment Holdings, LLC; Jaeme Adams; Katrina Adams; and Christopher Hamilton collectively as "Sellers." This opinion cites to: C.A. No. 2021-0447-KSJM docket entries (by docket "Dkt." number); trial exhibits (by "JX-" number); Buyers' trial demonstratives (by "DDX-" number); the trial transcript, Dkts. 611–14, 626 ("Trial Tr."); and stipulated facts in Section II of the Parties' Stipulation and Pre-Trial Order, Dkt. 584 ("PTO").

# I. FACTUAL BACKGROUND

OSC Investment, L.P. acquired SwervePay on February 24, 2020 through a Membership Interest Purchase Agreement.[2] The Purchase Agreement provided three potential earnouts. Those earnouts were contingent on SwervePay's post-closing achievement of net payments revenue targets during the period of January 1, 2021 through December 31, 2021 (the "Earnout Period").[3] The revenue targets depended on three key variables: payment volume, take rate, and conversion rate.[4]

The Purchase Agreement required Buyers to provide Sellers with a statement calculating the net payments revenue generated toward the earnout milestones after the Earnout Period concluded.[5] The Purchase Agreement also required that the statement include "reasonable supporting information."[6] On July 8, 2022—after Sellers initiated this litigation—Buyers sent Sellers the Earnout Statement.[7] Matthew Dubbioso, Michael Oshinsky, and employees of Ontario Systems, LLC ("Ontario") had prepared the Earnout Statement, which they then used to calculate

---

[2] JX-841 ("Purchase Agreement").

[3] *Id.* § 2.10; PTO ¶ 115.

[4] *See generally* JX-1787 ¶¶ 70–75; Trial Tr. at 1299:15–1301:16 (Austin).

[5] Purchase Agreement § 2.10(d).

[6] *Id.*

[7] *See* JX-1673 and JX-1676 (together, the "Earnout Statement").

net payments revenue going toward the earnouts.[8]  The Earnout Statement implies a take rate and conversion rate for 2021 of 0.17% and 12.5%, respectively.[9]

On July 7, 2023, and again on February 16, 2024, Sellers moved to compel production of documents supporting the Earnout Statement.[10]  Buyers represented that all responsive documents had been or would be produced.[11]

Dissatisfied with Buyers' production, Sellers moved to compel production of the documents a third time on June 18, 2024.[12]  On July 22, 2024, the court-appointed discovery magistrate recommended granting Sellers' motion.[13]  Buyers subsequently disclosed that they could not produce transaction data and invoices from Intacct, Ontario's accounting software, because the information was inadvertently deleted in February 2024 when Ontario did not renew the company's Intacct subscription.[14]  Buyers did produce some documentation from another data source, Base, but Sellers suspect those documents were altered and could not determine when or by whom.[15]

---

[8] JX-1885 ¶ 35.

[9] *See* Dkt. 637 ("Buyers' Post-Trial Opening Br.") at 73–74 (citing Trial Tr. at 729:22–730:4 (Hayes); *id.* at 621:24–622:5 (Beach); *id.* at 1299:15–1300:17 (Austin); DDX-007.10; JX-1820, Ex. 2).

[10] Dkts. 152, 353.

[11] Dkt. 400 at 2–3.

[12] Dkt. 445.

[13] Dkt. 491 at 14.

[14] *See* Dkt. 533 ("Buyers' Opposition to Mot. in Lim.") ¶¶ 10–15, 22.

[15] Dkt. 547 ("Sellers' Reply in Supp. of Mot. in Lim.") ¶ 10 ("Over half the documents Buyers represent were provided by Base contain highlighting, *see, e.g.,* [Buyers' Opposition to Mot. in Lim.] Exs.-36, 38-40, include extraneous data and calculations, *see, e.g., id.* Exs.-37, 40-41, or otherwise indicate data deletion, *see, e.g., id.* Ex.-37.").

Before trial, Sellers moved to preclude the Earnout Statement as unreliable and undermined by spoliation.[16] Specifically, Sellers asserted that Buyers did not provide with the Earnout Statement in July 2022, or later produce in discovery, "Intacct, client invoices, payment processor (BASE and WorldPay) information, and vendor invoices as data sources for the gross revenue, contra revenue," and cost of goods sold figures in the Earnout Statement.[17] Sellers also took issue with the Earnout Statement's use of "hardcoded inputs for revenue, volume, and costs" and identified several discrepancies in the Earnout Statement's calculations.[18]

The court heard argument on Sellers' motion at the pre-trial conference on October 22, 2024.[19] The court declined to preclude the Earnout Statement, but without prejudice to Sellers reasserting their arguments at trial, allowing a fully developed record to inform the force of those arguments.[20]

At trial, Buyers relied on the Earnout Statement to introduce the take rate and conversion rate.[21] So did their experts.[22] In post-trial briefing and argument, Sellers

---

[16] Dkt. 528 ("Sellers' Mot. in Lim.").

[17] *Id.* ¶ 8.

[18] *See, e.g., id.* ¶¶ 8, 12; Sellers' Reply in Supp. of Mot. in Lim. ¶¶ 13–16.

[19] Dkt. 609 ("Pre-Trial Conference Tr.") at 31:6–43:20.

[20] *Id.* at 43:3–20.

[21] Buyers' Post-Trial Opening Br. at 73–74.

[22] Trial Tr. at 714:18–715:3, 729:10–730:4, 782:15–783:23, 785:16–789:4 (Hayes); *id.* at 1299:15–1300:17, 1304:10–23, 1319:2–17 (Austin).

renewed their request to exclude the Earnout Statement.[23]  In the first of many post-trial opinions, this memorandum opinion resolves that request.

## II.    LEGAL ANALYSIS

Court of Chancery Rule 37(e)(1) provides that, if electronically stored information that a party is obligated to preserve "is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court[,] upon finding prejudice to another party from loss of information, may order measures no greater than necessary to cure the prejudice[.]"[24] This court has analyzed spoliation issues under a four-part framework: (1) whether the ESI should have been preserved; (2) whether it is lost and cannot be replaced; (3) whether the loss was due to a party's failure to make reasonable preservation efforts; and (4) whether the other party was prejudiced such that some sanction is warranted.[25]

### A.    Buyers Should Have Preserved The Underlying Data.

Because Buyers created the Earnout Statement while this litigation was pending, and because it is the cornerstone of their proximate causation argument,

---

[23] Dkt. 634 ("Sellers' Post-Trial Opening Br.") at 98–99; Dkt. 639 at 69; Dkt. 650 at 32:10–33:8.

[24] Ct. Ch. R. 37(e)(1).

[25] *Goldstein v. Denner*, 310 A.3d 548, 571–83 (Del. Ch.), *cert. denied*, 2024 WL 776033 (Del. Ch. Feb. 26, 2024), *and appeal refused*, 346 A.3d 1123 (Del. 2024).

Buyers should have preserved its inputs.  Buyers do not dispute the first prong of this analysis.[26]  This element is met.

### B.     The Underlying Data Is Lost.

Buyers argue that the "relevant" information is not lost and has been produced.[27]  But as discussed more fully below, the transaction- and invoice-level Intacct data is relevant, particularly given Buyers' and their experts' exclusive reliance at trial on the hardcoded Earnout Statement for the take rate and conversion rate.  Buyers concede that they "no longer have access to the Intacct platform" and this data.[28]  The data is lost, satisfying the second element.

### C.     Buyers Failed To Make Reasonable Preservation Efforts.

By February 2024, when Ontario did not renew its Intacct subscription, Sellers had moved to compel production of documents underlying the Earnout Statement not once but twice.[29]  Even if Buyers could have argued that, before this point, they reasonably did not expect Intacct data to be relevant to this case, Buyers were on notice that this information was relevant at least by the time they let the subscription

---

[26] Pretrial Conference Tr. at 38:2–18 (twice arguing that "there's no spoliation for two reasons.  First, all of this information has been produced in some form; and two, there's been no prejudice."); *see also* Buyers' Opposition to Mot. in Lim. ¶¶ 27–43 (arguing only that relevant data was not lost, that Ontario made reasonable preservation efforts, and that Sellers were not prejudiced).

[27] *See, e.g.*, Buyers' Opposition to Mot. in Lim. ¶¶ 27–28.

[28] *Id.* ¶ 8.

[29] Dkts. 152, 353.

lapse. At the pre-trial conference, Buyers did not dispute this prong either.[30] Buyers' conduct falls short of reasonable preservation efforts, and this element is met.

### D. Sellers Were Prejudiced.

"Rule 37(e)(1) requires that a party have suffered prejudice before a court will impose sanctions for failing to preserve ESI. Prejudice exists when spoliation prevents a party from obtaining and potentially using relevant evidence."[31] The complaining party "must provide a plausible explanation as to why the evidence could have been relevant such that the failure to preserve is prejudicial."[32]

Sellers contend that they need the lost data to verify the Earnout Statement's calculations.[33] That verification is important to Sellers for two reasons. First, the Earnout Statement's 0.17% take rate is significantly lower than the take rate used in other contemporaneous documents Buyers produced.[34] Ontario's board presentations stated that Ontario's December 2021 year-to-date take rate was 0.61%, and a Blue Star investor presentation prepared sometime in November 2021 stated that Ontario's take rate was 0.92%.[35] Had the take rate been even the lower of those two figures, Sellers' damages case would have been much easier to prove. Second, the Earnout Statement was created during this litigation by Dubbioso and Oshinsky—

---

[30] Pretrial Conference Tr. at 38:2–18 (arguing only loss and prejudice).

[31] *Goldstein*, 310 A.3d at 583.

[32] *Id.* at 584.

[33] *See, e.g.*, Sellers' Post-Trial Opening Br. at 98–99.

[34] *Compare* JX-1673 and JX-1820, Ex. 2, *with* JX-1624 at 6 and JX-1690 at 15.

[35] JX-1624 at 6; JX-1690 at 15.

both of whom Sellers believe defrauded them and thus "had a reason to build an earnout statement that showed that the sellers would not have achieved the earnout" either way.[36]

Sellers' concerns are understandable, given the degree to which Buyers and their experts rely on the Earnout Statement. This one piece of evidence is the basis for Buyers' assertions that SwervePay would have fallen short of its earnout revenue targets regardless of the allegedly misrepresented payment volume. At trial, both of Buyers' experts confirmed that their analyses used a take rate of 0.17% for 2021 based on the Earnout Statement.[37] Both experts also confirmed that they relied on the accuracy of the Earnout Statement and did not independently review the underlying invoice and transaction data to verify its calculations.[38] Buyers, in turn, rely on those analyses to argue that Sellers failed to prove proximate causation.[39]

These circumstances rendered it critical for Sellers—and this court—to be able to verify the Earnout Statement's accuracy. But Buyers failed to preserve or otherwise produce data needed to verify the Earnout Statement. The "invoice-level reports" that Ontario generated "by pulling invoice-level data from Intacct before the

---

[36] Post-Trial Oral Arg. Tr. at 33:1–8.

[37] Trial Tr. at 729:14–730:4, 782:15–783:4 (Hayes); *id.* at 1304:10–13, 1319:2–6 (Austin).

[38] *Id.* at 783:1–23, 785:16–789:4 (Hayes); *id.* at 1304:14–23, 1319:7–17 (Austin) (testifying to only reviewing Buyers' self-generated "invoice-level" reports, as opposed to the actual invoices themselves).

[39] Buyers' Post-Trial Opening Br. at 73–74 ("Sellers missed the earnouts because SwervePay's take rate was very low, at only 0.17%, and its conversion rate was 12.5%.").

subscription lapsed and putting it into Excel spreadsheets" are insufficient for this purpose.[40] Like the Earnout Statement, the reports were generated during this litigation.[41] The reports only show "a line item for each client summarizing how much they were charged based on their processing volume and contract rate and showing their fee due to" Ontario."[42] And the reports do not explain the gaps and discrepancies in the Earnout Statement's calculations.[43]

Thus, without the lost or unproduced data, neither this court nor Sellers can verify the take rate or conversion rate implied by the Earnout Statement at the customer level. Given Buyers' reliance on those rates at trial, Sellers have been prejudiced by Buyers' spoliation. This element, like the others, is met.

## III. CONCLUSION

Consistent with this court's ruling at the pre-trial conference, and now with the benefit of a fully developed trial record, the court declines to impose sanctions but finds that Sellers' concerns speak to the weight of the evidence. The court accordingly gives the Earnout Statement's take rate and conversion rate no weight.

---

[40] Buyers' Opposition to Mot. in Lim. ¶ 15.

[41] *Id.*

[42] *Id.* ¶ 12.

[43] *See, e.g.*, Sellers' Reply in Supp. of Mot. in Lim. ¶¶ 15–16.